United States District Court
Southern District of Texas
ENTERED
JUL 0 1 1998
Michael N. Milby, Clerk of Court
By Deputy Clerk

United States District Court
Southern District of Texas
FILED
JUN 2 6 1998
Michael N. Milby, Clerk of Court

241

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

TEXAS MUNICIPAL LEAGUE GROUP § 
BENEFITS RISK POOL, ET AL §
§
VS § CIVIL ACTION NO. B-91-166
§
HARTFORD LIFE AND ACCIDENT §
INSURANCE COMPANY AND §
HARTFORD FIRE INSURANCE COMPANY §

## MEMORANDUM AND ORDER

Both parties agree that the summary judgment opinion previously entered in this matter was in error in stating that the CITY OF BEAUMONT (hereinafter "BEAUMONT") was self insured for its liability under its health benefits plan for its employees. Further, both agree that this error has no bearing on the validity of the summary judgment ruling.

The relationship between BEAUMONT and the HARTFORD COMPANIES[1] its insurer, is based on formal insurance agreements defining

---

[1]The contracts refer to a specific HARTFORD COMPANY but specifically state that the naming of a specific HARTFORD COMPANY means any of HARTFORD's subsidiaries or affiliates to which it may assign its duties under the MPP.

HARTFORD's insurance obligations to BEAUMONT and its employees and the "Minimum Premium Agreement" (MPP). It is the impact of the MPP on the insuring relationships that is essentially in dispute. HARTFORD claims that MPP is unambiguous and imposes an obligation to pay claims incurred before October 1, 1989, only if those claims have been presented to HARTFORD within sufficient time before October 1, 1989, so that HARTFORD had a reasonable time to pay them before that date. BEAUMONT claims that the obligation to pay the claims incurred before October 1, 1989, became fixed if due proof of loss was provided to HARTFORD any time before October 1, 1989.

The MPP essentially changes the premium payment timing and amounts originally provided for in the group insurance agreements. BEAUMONT accepts the ultimate liability for the payment of benefits under the group policy by reimbursing HARTFORD for the amounts HARTFORD paid in benefits as BEAUMONT's agent. This was subject to the maximum amounts stated in the MPP.

The MPP provides that benefits become "DUE" when HARTFORD receives "due proof of loss...for a valid claim" for benefits.[2] An

---

[2] 1(e) of the MPP

expense is incurred "on the date the service or supply giving rise to such expense is rendered or furnished."[3]

Since the issue in this case deals with when claims are incurred, when claims or proofs of loss are received by the HARTFORD and when claims are to be paid, note must first be made of the last sentence of section 2 which provides: "If an expense is incurred while the agreement is in effect, but is not paid before the date this agreement terminates, its disposition shall be determined by the terms of paragraph 3(d) of this agreement." Since both parties acknowledged that the insertion of "3(d)" in this sentence was a scrivener's error and should have been "3(g)", the sentence will be treated as the parties intended; i.e., that it said "3(g)".

That sentence rewritten to insert the dates we now know are pertinent would read ad follows: if an expense is incurred on or before September 30, 1989, but is not paid before the end of the day on September 30, 1989, its disposition shall be determined by paragraph 3(g).

---

[3] 1(g) of the MPP

Case 1:91-cv-00166   Document 240   Filed in TXSD on 06/22/1998   Page 4 of 14

4

Paragraph 3(g) provides that after the agreement terminates (September 30, 1989), BEAUMONT's obligation to provide funds to pay plan benefits ceases when BEAUMONT pays in accordance with Paragraph 7 sufficient funds to satisfy benefits "<u>paid</u> up to the date of termination" (end of day on September 30, 1989). After that HARTFORD is to pay all benefits which "are due or become due," and BEAUMONT is to reimburse HARTFORD no more than the lesser of (1) the amount of such benefits and the administrative costs of their payment or (2) the Plan Benefit Extension Limits. (Emphasis supplied)

Paragraph 3(f) comes into play here in the analysis of the MPP because like 3(g) it is operative after the agreement terminates. It provides that after the agreement terminates BEAUMONT's obligation to provide funds for the payment of benefits "shall cease with the payment of funds sufficient to satisfy all such benefits <u>paid or payable</u> to Participants up to the end" of the day on September 30, 1989. (Emphasis supplied)

The terms of 3(g) and (f) are different and lead to BEAUMONT's claim that they are inconsistent. BEAUMONT notes that 3(g) refers to BEAUMONT's obligation to pay HARTFORD ceasing when it reimburses the amount necessary to satisfy benefits "paid" up to the end of

5

the day on September 30, 1989, while 3(f) refers to BEAUMONT's payment of the amount of benefits "paid or payable"[4] by the end of the day of September 30, 1989. BEAUMONT argues that "or payable" should be read into 3(g) as that was what was obviously included. HARTFORD on the other hand claims that the provisions are not inconsistent and the difference was intended.

It is obvious that the language is clear in both provisions, so in that sense, there is no ambiguity. Ambiguity is claimed by BEAUMONT apparently on the basis that the amount of identical reimbursement obligations have two inconsistent measures: first, the claims paid or payable under 3(f); and second, the claims paid under 3(g).

Therefore, the issue appears to require a determination as to whether those inconsistent measures apply to the same situation or different situations. If the same, then the inconsistencies can be an ambiguity. If different, then there is no ambiguity.

I now turn to a reading of the MPP to make that determination.[5]

---

[4]Paragraph 7 only relates to the method of timing of the transfer.

[5]The mother of all the nightmares of a judge--attempting to understand language prepared by insurers.

6

Paragraph (f) provides that after September 30, 1989, the termination date of the contract, BEAUMONT must pay HARTFORD enough money to reimburse HARTFORD for the amount HARTFORD had paid under the contract. The moment the contract terminated--the end of the day of September 30, 1989, HARTFORD had to pay all claims then payable. This is a typical "run-out" claim--that is, both the service was provided and the claim therefor received before the end of September 30, 1989. The term "paid or payable" makes sense to describe the run out at the end of the contract year and thus was intentional.

But there is a second kind of a "run-out" claim--one where the service was provided in the contract year, but the claim therefor was not received by the end of the contract year. Thus Paragraph (g) provides that BEAUMONT has no obligation to provide any funds other than to satisfy benefits <u>paid</u> by HARTFORD before the end of the contract.[6] And if BEAUMONT wants HARTFORD to pay this second type of "run-out"--claims incurred before the end of September 30, 1989, for which bills were not received by HARTFORD

---

[6]That leaves unpaid both the first kind of "run-out" claim as mentioned in discussing Paragraph (f) and also includes the second kind of "run-out" claim.

by the end of the day of September 30, 1989, BEAUMONT must agree to reimburse HARTFORD the lessor of the benefits plus administrative costs or the amount of the Plan Benefit Extension Limit.

Thus Paragraph (g) was designed to provide reimbursement of HARTFORD if HARTFORD were to continue to act as the third-party administrator for both kind of "run-out" claims.

In short, Paragraph (f) pertains to the relationship if it ended at the end of the contract year and thus dealt with claims "due and payable" before the end of the contract year.[7] It is only logical that BEAUMONT must reimburse HARTFORD the amount HARTFORD was required to pay for those due and payable claims.

Paragraph (g) deals with the continuation of the relationship which included dealing with the claims that became payable after the end of the contract year since they had not been received by the end of the contract year. Since HARTFORD already had the right to be reimbursed under Paragraph (h) for the first type of "run-out" services performed (for claims received before the contract year ended), reimbursement only had to be provided for claims due

---

[7]Meaning those claims relating to services provided in the contract year for which a claim had been received but not paid in the contract year.

or become due after September 30, 1989. Thus if BEAUMONT wanted HARTFORD to pay the second kind of "run-out", BEAUMONT had to make a different reimbursement arrangement under Paragraph (g)--it had to agree to pay the lessor of an amount of the benefits paid plus administrative costs or the Plan Benefit Extension Limit. In either event, BEAUMONT had to secure the amount of the Plan Benefit Extension Limits by a letter of credit or other collateral.

BEAUMONT opted not to have HARTFORD pay the second kind of "run-out" claim and, thus, did not secure the payment under Paragraph (g). HARTFORD, of course, was not obligated to do the Paragraph (g) type "run-out". It continued, however, to be obligated to pay all claims "due and payable" before the end of the contract year--i.e., the first type "run-out".

Accordingly, I find no inconsistency or ambiguity.

When BEAUMONT rejected continuation under Paragraph (g), then only Paragraph (f) applied and since HARTFORD was obligated to pay the amount due and payable before the end of the contact year, BEAUMONT's obligation to reimburse them the "due and payable" amount is logical.

Accordingly, HARTFORD has no liability except for amounts which were due <u>and payable</u> before the end of the year and reimbursement, therefore, is governed by Paragraph (f).

A moment is needed to acknowledge Judge Thomas M. Reavley's contrary ruling on the Summary Judgment Motion which is effectively nullified by the present ruling upon BEAUMONT's request for reconsideration. He relied on Paragraph 3(d) which provided: "if at the end of any contract year, the cumulative amount of benefits we have paid on your behalf, and for which you have reimbursed us in accordance with Paragraph 7 of our agreement, with respect to all Participants exceeds the Plan Liability Limit for that contract year, we agree to reimburse to you the amount of excess." Judge Reavley said "This section is not ambiguous. It clearly provides that only benefits paid and not those becoming due within the contract year are considered in determining whether Plan Liability Limit has been reached..."

This interpretation puts the critical moment to be the moment the year ended based on the language "at the end of year."

In arriving at a contrary conclusion, it is important to note that Paragraph 3(d) does not state what is to take place within the contract year. It is really a provision inserting the concept of

the Plan Liability Limit and indicates what happens "at the end of the any plan liability year." With all due respect to Judge Reavley, the section relied on does not mean and was not intended to mean what takes place in a calender year. A contract year includes all transactions within that year and the consequences that may take place after the end of the that year as a result of those transactions.

One has to look elsewhere within the contract to determine what is significant to take place within the contract year that may have results outside the contact year to compute the Plan Liability Limit and the amount in excess thereof. This means that the language "at the end of any contract year" does not mean that the next phrase, "the cumulative effect of benefits we have paid on your behalf," means that those benefits had to be paid by the end of the year. It means, as it has already been explained, claims that were due during the contract year and paid thereafter.

The last section of paragraph 2 provides, "If an expense is incurred while the agreement is in effect, but is NOT PAID before the date of this agreement terminates, its disposition shall be determined by the terms of Paragraph 3(d)." But a close examination of Paragraph 3(d) shows that it makes no disposition of

expenses incurred but NOT PAID within the contract year. Paragraph 3(d) is silent as to the subject. That is why the issue in this case must be governed by Paragraph 3(f) which provides that BEAUMONT's obligation to provide funds to pay benefits ceases when BEAUMONT pays "funds sufficient to satisfy all such benefits paid <u>or payable</u> to Participants up to the date of termination" of the agreement.

Why does Beaumont have to pay funds to HARTFORD sufficient to pay all benefits paid "or payable" if HARTFORD has no obligation to pay "payable" benefits? Is HARTFORD taking the position it can receive monies for benefits payable but not paid during the benefit year and keep them? Surely not. Clearly BEAUMONT must pay funds sufficient to reimburse HARTFORD for the benefits HARTFORD paid out. It follows that HARTFORD was obligated to pay all benefits "payable" before the contract expired even if the benefits are paid after expiration regardless of when they were processed for payment.

Having made the liability determination on BEAUMONT's contract claims, the Texas Deceptive Trade Practices Act (DTPA) claim must

be resolved. Its claim is summarized in its documents submitted as part of its oral argument as follows:

    a.    The MPP has an insurance component through HARTFORD's insuring BEAUMONT. Further as it works with the group policies, it is part of the insurance contract with BEAUMONT.

    b.    21.21 of the Insurance Code states that it is a deceptive act to "make" a "statement misrepresenting the terms of any policy.....to be issued....." which HARTFORD did by selling an MPP that based liability upon payable claims but never attempting to determine liability except on a paid basis. This is the same language as DTPA section 17.46(5).

    c.    21.21-2 of the Insurance Code states that it is an unfair claims settlement practice to "knowingly misrepresent to claimants pertinent....policy provisions..". HARTFORD, when BEAUMONT requested a copy of it's MPP, which had difference material provisions, and mailed the 1987 MPP only to BEAUMONT representing it as the agreement between the parties.

    d.    Section 16 of 21.21 recites the same penalties as for violations of 17.46 of the DTPA.

The Court finds that no deceptive act by HARTFORD was established. Moreover, no statement misrepresenting the terms of any policy was made. At most, HARTFORD misinterpreted language in the MPP which language was itself never misrepresented. A disputed interpretation is not a deceptive act. Similarly, disputing a

claim based on interpretation of contract language is not a misrepresentation of the policy provisions.

Not only is this obviously true, but the same interpretation was made by Judge Reavley who in no way can be charged with a deceptive act. The conclusion is compelled that a differing contract interpretation resulting in good faith legal disputes can not be deemed a deceptive trade practice whether one is examining it under the DTPA or the insurance code.

Judgment should be entered for HARTFORD on the DTPA claim.

As to any claim for breach of an implied duty to timely process claims (if such a claim exists) is irrelevant in view of the contract interpretation rendered herein.

As to damages to which BEAUMONT is entitled under the contract claim, BEAUMONT established by a preponderance of the evidence that $386,868.41 in claims were received by HARTFORD prior to October 1, 1989. Correction for clerical errors reduced this claim to $371,868.41. The only necessity to constitute a claim for which HARTFORD is liable is a bill showing a charge during the year for a service covered under the underlying insuring agreements. The amount aforesaid meets this test.

The parties on oral argument sought an opportunity to resolve the issues of interest and attorneys' fees on any award granted. Within 20 days after the date hereof, the parties are to arrange a telephone conference with the Court as to the remaining two issues as well as the form of the judgment.

DONE at Brownsville, Texas, this 26th day of June, 1998.

_____
Stewart A. Newblatt
United States District Judge